Case number 20-1090 et al. RAV Truck and Trailer Repairs, Inc. and Concrete Express of New York, LLC Petitioners v. National Labor Relations Board. Mr. Tulancic for the petitioner, Mr. Sautter for the respondent. Mr. Tulancic, good morning and you may proceed. Good morning, your honors. May it please the court. The board's remedial order in this case should not be enforced because compliance with the order would cause my client substantial economic harm. My client closed his business because he lost his lease and because he was operating at a substantial loss. He had lost $270,000 in 2017. He was losing some $44,000, I believe, up through May of 2018. My client operated a registered motor vehicle repair shop in New York. What that means is he can perform repairs on third-party vehicles for compensation. The building itself is what is registered, not the business, so when my client lost his lease, he also lost his registration. He moved to a different location for a period of three months. The lease specifically stated it was to finish the repairs from the old location. The lease terminated at the end of May 2018 and he shut down the business. According to board case law, even if the closing is found to be discriminatory, the restoration order should not be enforced because, as written, it requires my client to violate New York law and it also causes my client to restore an unprofitable business, which board case law clearly states they will not and cannot do. So, in this matter, the board is arbitrarily applying case law to force my company to reopen. Also, my company under Darlington— Did you put in any decent evidence before the board on your client's economic situation? Can you hear me okay? Yes, Your Honor. Okay. We did. We filed a— You just put in a tax return belatedly that was— We put in a— The tax return that we submitted at trial was not signed. That tax return was filed in September electronically. That is why it was not signed. The judge asked for a signed copy. My client signed it. We submitted it five months before he issued his decision, but it was filed in September. Did you try this before the board? I did, Your Honor. When you reflect back on it, if you're trying to prove economic incapacity, is that really the way you'd make your case? I'm not getting it. I mean, there's no brain surgery required here. If you're trying to show I lost a lease and here are my financials, you stick in a tax return and that's it? I mean, I'm sorry if it sounds a little bit callous, but I don't get it. I understand what you're saying. I presented the evidence. What evidence? That was given to me. Oh, okay. The evidence. So wait, I need to understand this because I'm being totally honest with you. We're all smart people sitting on this screen. That isn't the way you'd prove economic incapacity. It's really not a hard thing to do to show that I have a client. Our claim is that in this business that we're fighting over, there were continuous losses and there's no prospect of it getting better and we've lost the lease, et cetera, et cetera. It's an easy way to prove those things. Now, are you telling us now that you simply, because of the situation you were in, you couldn't get more than you put in? Because what you put in was silly. Your Honor, that's your opinion. I disagree. No, no, counsel, you just said there are better ways to do it, to show economic incapacity. First, an unsigned tax return and the return doesn't tell you anything other than, it's a snapshot, but it doesn't tell you what's going on with a business. And that's all you put in, an economic return, I mean, a tax return? That showed my client lost $272,000. Yes. But that doesn't tell you about ongoing capacity. All right. You're answering my question. That's all you put in. I thought you were indicating to us that that's all you were given. And so that's why that's all you put in. Correct. That's correct, Your Honor. That gives me some explanation, because I still want you to know, as a lawyer like you, if that's the best you can do, improving economic incapacity, you really ought to rethink it. That's not the way you do it. I'm sorry you think that, Your Honor. And it's an important point, as it turns out, under the case law. That's why I'm all over you on this. It's a very important point. You made our work, you're making our work a whole lot harder. I don't disagree with that. But the case law is clear. He lost his lease. He didn't close because of the union. Excuse me? No, go ahead. I'm sorry. No, I didn't hear. I didn't know if you were speaking a question. I'm sorry. No, the case law. I didn't know what you said. The case law is clear. And then you said he lost his lease. Yeah, the case. I mean, there's a case that I cited that is the same exact issue. Did you put the lease in? Yes, both leases are in. Okay. Both leases are in. He lost his lease. So therefore, he lost his operation of being a quote unquote, registered repair shop. Right. He simply leased 600 square feet in another location that wasn't registered to finish the repairs. And then he was done. He shut the business down. In Chariot Marine Fabricators Industry Corp. 335 NLRB 339 2001. There was no restoration order where a single operation, but continued its profitable operation, even though the closing violated Section 8A3 of the Act. The board said the restoration would be unduly burdensome because the employer lost its lease, would be forced to lease a new premise, and would require reopening two years after closure, and would therefore threaten the viability of the profitable operation. He cannot. There's three options on the table for him under the board's order right now. He can violate New York law and be fined $1,000 each time he gets caught. That's all in the record. That's in the record. He can find a new location to either lease or buy, and have it retrofitted to become a registered motor vehicle repair shop, all which requires automatic sprinklers, fire alarms, standpipes, oil and water separation, mechanical ventilation. Or he can try to find a new lease of a building that's already registered. Was the case that you just cited Chariot Marine? Yes. Yeah, and that's where the company's controller testified to the company's monthly financials, right? I believe so. Yeah. Is that what happened here? It is not, Your Honor. Yeah, right. That's what I'm asking. That's my concern. You're making it so much harder for us than it otherwise needs to be. How long did they continue finishing up, as you put it? He signed the lease in April. No, yes, he signed the lease in April, wasn't allowed to begin repairs until mid to late April. He closed the business. He was done with repairs mid-May, closed the business in mid-May, so he operated for a month. And there's evidence in the record to indicate that that second lease no longer exists? Correct. That lease had an expiration date of 5-31-2018. All right. And what's the evidence indicating that he no longer does repair work? What's the other business doing? That's the truck? It's a concrete business. So, cement trucks, they mix on site, they deliver concrete. Right. And that's still operating? That is still operating. They are operating, at the current time, two to three trucks. And how many employees there? I believe it is two drivers, a dual employee yard man mechanic, and the owner. And what do I do as a judge with the undisputed evidence that in this case, everyone agrees that this is one operation? Correct. Just like it was in Chariot Marine Fabricators. Chariot Marine Fabricators has some evidence in it, but in any event, I'm still... What does that mean? If he's one operation. One operation was a motor vehicle repair shop. They performed repairs on third-party trucks. We've admitted that they also performed some repairs on his concrete trucks. The two mechanics that operated it, Rob, one said he spent two to three days a week on the trucks. The other said he spent two to three hours a day on the truck. So the record indicates that it's one operation, undisputed, and there's crossover work. There is some crossover work, but the other case, there is another case out there, and the judge did find that Concrete Express does have a mechanic that performs work only on the Concrete Express trucks. Which means what? Wait a minute. I'm trying to get you to understand what I'm understanding about the record. The one operation. One owner, one... That's conceded. It's one operation. Correct. Two separate businesses, one operation. And well, there are lots of businesses that do more than one thing, so that's not really interesting. There are lots of businesses that exist that way. And you've kind of constructed a picture here, a legal picture of one operation that does a couple of things, and apparently there's crossover work. If I'm working in one side, I can also work in the other side. Yes? No, no. That is not what happens. Never happens? I thought you just told me it does happen. I thought you told me... No, no. I understand what you're saying. There are two separate locations. Right. I understand. Concrete trucks, which at Concrete Express, and they have their own mechanic. There was Rav Truck and Trailer Repair that had their own mechanics that worked on third party trucks. That was their business model. Did Rav ever work on the cement side? They've worked on some of the cement trucks. Yes. All right. So that in this record, in a single operation, the record indicates that it not only was possible, it had been done that people in Rav could work on the cement side. That was nothing unusual about that. The frequency is not the question I'm raising. It was done. You're correct. Yes. Okay. So, and I'm trying to give this some context because you're fighting about the restoration order, and I understand that. But you see, when you think about it, and it's one employer and one operation for this legal record, a remedy could be constructed where, to the extent that there was work available, the employees in Rav who allegedly have no more work to do in the Rav operation could do it in the cement operation. That would remain to be seen in compliance. They can work. Yes. There's two trucks where now three mechanics would be working on two trucks, and they would no longer be receiving a profit from working on those trucks. That's all the matter. Rather than shutting down one business, we're going to shut down two businesses. You're not listening to my question. You're fighting about something I'm not raising. The economic inability is one issue. I'm respectful of that. I'm not fighting that. That remains to be seen, in part because you didn't prove it very well. The question I'm raising is the possibility of Rav, people who mostly worked in Rav, being able to work in cement in what is a single operation. You're conceding, yes, that possibility exists. You're saying, but there may be a problem because they may not make any money if they do it that way. No. The problem is there is little to no work to do. You're asking mechanics to work on two trucks. Make the argument about economic incapacity. Leave it aside. I'm not doubting the importance of that. I want to make sure I have this structure straight in my head. You're not doubting there's a single operation in which employees on either side can work on the other side. They could go to Concrete Express and sit there and not do anything. No, no, no. You're being sarcastic. Your Honor, I'm not. If I'm a counsel, then let's do it this way. Let's assume cement has more work than they know what to do with. Is it very likely that people in Rav could be put over there? If they have more work than they know what to do with, yes, but they do not. Please don't quibble with it. They have more work than they know what to do with. Stay with my question, please. It's really frustrating. Stay with my question. I'm trying to understand this case. They have more than they know what to do with. In the structure that you have, I thought, conceded exists as I'm describing it, there's one operation. If the work goes down in Rav, in this one operation, people in Rav can go over to the cement side and do the work there, and that would not be a surprise if the work was there. Yes or no? No, because Concrete Express has its own mechanic. Concrete Express has its own mechanic. If there's more work than Concrete Express knows what to do with. If there's more work than they know what to do with. And the Rav people are now out of work, would it be a surprise to anyone that this owner would say, well, I want some of the Rav people to go over the cement and work there, right? If there's more work than they know what to do with. Yes, I've said that 12 times now. Your Honor, I understand that. No, it's really annoying what you're doing. Stop playing with me. Answer my question. If there is more work than they know what to do with. I'm going to say it one more time, because it's really important. I've really tried to understand that case, and I'm not unsympathetic to the claim you're making, but you're making this really hard. I'm trying to figure out what the corporate structure is here. There is an operation on one side and one operation on the other side. You're telling me they're and you're quibbling over whether or not they could afford to move people over. I'm giving you a hypothetical, and I'm entitled to do that as a judge. I'm giving you a hypothetical that the cement side now has tons of work. Would it be a surprise to you or would I be wrong in saying it would not be a surprise at all that the Rav people would be moved over to the cement side and do that work? If there was work available, they could go over and do that work. Thank you. It's taken us 12 minutes to get there. That's all I wanted to know. Judge Tatel, do you have any questions? I just have one very quick question, which is you and Judge Edwards have been talking about the remedy. I just have one question about the underlying violation, and it's this. It's about Trattini's testimony. It was critical to a whole series of issues here, to Valencia's termination, to Gonzalez's layoff, to the partial closure, to Rav's economic state. It's critical to all of those issues. The board and the ALJ discredited his testimony on all of those issues, and you don't challenge that here, correct? Your Honor, do you know why I didn't challenge that? Just answer my question. No, I do not. Let me finish my question. My question is that since that's unchallenged, since his testimony is discredited, when I looked at your briefs and I read them carefully, I found almost nothing that could be used to counter the board's evidence in support of all this. Can I speak, Your Honor? Yes. Now you can answer my question. Am I right about that? What evidence is there in the record that you would point to other than Trattini that would sustain your burden on any of these issues? The fact that the mechanic's own testimony says that they spend limited amounts of time working on the Concrete Express trucks. Their own testimony from Valencia said, I spend two to three hours a day on Concrete Express trucks. That's 15 hours a week. I'm not talking about the remedy. I'm talking about the underlying violation. I'm talking about the underlying violation that they were terminated because of their activities. That's what I'm talking about. And the evidence that you rely on is Trattini, but he was discredited. So I just, I don't see your case anymore, which is exactly why I thought you stood up talking about the remedy. I said, oh, he's, he's onto something. You know, he's going to skip his weak case that is the merits and talk about the remedy. Am I right about that? Yes, Your Honor. And can I, can I tell you why I skipped the credibility? The last time I was before this court, I had three pages of a brief where a witness lied and admitted lying under oath. And I argued credibility. And I was told that I was barking up the wrong tree. Well, this is a totally different case. We have lots of cases. It can't be a serious argument. I'm sorry, Harry, go ahead. No, I'm sorry. I'm sorry. I mean, we have lots of cases. We have lots of lawyers for companies who, who, who not lots, but we do have lawyers who stand up here and actually make an effective argument about an NLRB credibility finding. In fact, our case law permits that. So it's stunning to me that you would say, well, since you lost in one case, you didn't make the argument here. I just don't understand that. Your Honor, it wasn't that I lost. It was that I was told you're barking up the wrong tree. We don't overturn credibility. There's lots of trees in the forest and I understand that. Okay. Well, do you have anything more to say? All right. But can you do anything in terms of your client's case to reassure me that, uh, that other than Trentini, I'm now I'm talking about the underlying violation, the discharge of Gonzales and Valenti that in fact, let me just put it to you this way. Other than Trentini, what's the single best piece of evidence you would point to that supports your argument that the board's finding that those were motivated by anti-union animus is not supported by substantial evidence. What would you point to? Give me one thing. That he lost his lease and that he was already going to close the business. That's got nothing to do with the underlying violation of terminating Gonzales. So, okay. Um, I have no further questions. All right. Thank you. We'll give you a couple of minutes in reply. Mr. Stoddard. Morning, your honors. May it please this honorable court, Greg Sauter for the national labor relations board. Um, the board's finding of facts demonstrate that the company was virulently opposed to its employees joining the union just the week before the events of this case, they threatened to fire three separate employees at concrete express and close that business altogether. If they voted for the union significantly when those, um, when the, those events went to a hearing and the judge issued a decision, finding those facts, the company did not challenge a single one of them. And that court has that that case has enforced by the board. All right, Ken, let's move to, if I may, my colleagues, thank you back. Uh, let's assume that the record is as judge Tatel and your opposing counsel seem to be suggesting there isn't a lot here to support the company's challenges to the findings of the underlying violations. Let's assume that's all correct. Okay. The difficulty on your side, the thing, that's why I was trying to get answers from the other side. So we could sort this case out difficulty for your side is you have a Gissel bargaining order, uh, you know, and take giving you the benefit of the doubt soon seems like it's a plausible response to what the board was facing. That is, you now have a duty to bargain with the unit given these circumstances and you have a some underlying questions about economic, uh, whether or not the employer, uh, has a feasible operation. Um, I honestly can't square the Gissel bargaining order with the restoration order in my mind. I don't get what the board is trying to do there. Uh, in your mind, do you think the board is suggesting that there is a duty to bargain with respect to the effects of the closing of the operation? The board's not doubting it. The operation was closed, right? No. Okay. And the board's not doubting it. There is case law that says employers can close operations as they see fit, right? Of course. Okay. So then am I right in assuming that the most, the board ought to be able to compel here is bargaining over the effects of the closing? Uh, I, I respectfully disagree, your honor, but in this case, the board found that, um, the, the closing of RAV was a violation under Darlington intended. It was an act intended to chill the union activities that were ongoing at concrete express. And in those partial closing cases, the board standard remedy is to a biz restoration. So that is separate. Those cases routinely say, so long as we have some assurance that there are, the employer is, is in a position economically. Okay. Of course. Well, there's no finding there. And is that your claim is that, well, the burdens on them and they does the record show that the lease had run out? No, your honor, as we've shown in our brief, the, the, this was a month to month lease and under New York law, uh, a, um, a landlord cannot cancel a month to month lease without at least a 30 day notice. And there's no evidence of any 30 day notice in this case. In fact, I would point out your honor that as, as, as of the hearing in this concrete express had lease on the entire space of 3771 and 3773 merits. So we don't know how that lease transferred from RAV to concrete express, but I, I, I have reasons to doubt that this was ever an issue, but certainly there was never any, there's no proof that notice was ever given. Whereas when they lost their lease at Edison, Trentini testified that he had been given oral notice that the landlord was terminating that lease. All right. So let me, let me ask you this. Let's assume I'm trying to figure out what does this restoration order mean? Uh, let's assume that in the cases you pointing to, I think pose different factual scenarios. Let's assume there's a restoration order and it's viable. And the employer is told you have to open up again, and you have to bargain. The employer's obligation is I understand that in the law is to say, can say, uh, under the law to the union, I have to bargain with you. I'm bargaining. I want to let you know that I'm closing my business. I'm closing part of the business. And I'm happy to bargain over the effects. Isn't that, isn't that perfectly lawful? Let's assume all of what the board is. I don't know what the restoration mean. If they're in fact, really closing down, you say the record doesn't really show it. There's certainly enough to suggest there's not much there. There wasn't much there to begin with in terms of employees. Let's assume. And that means there, I'm sorry, go ahead. And that means that there's not much to rebuild either your honor. This is not a business where they have to, but the law, but the law doesn't law doesn't work that way. Employers aren't, aren't, at least I don't think it does. Employers aren't on obligation to stay in business. They don't want to stay in just because it would be easy to stay in the law. No, that's not the law, but they also can't close a business out of sheer. All right. I gave you my hypothetical. So you should have had enough time by now to think about what's your answer to it. The question I'm raising is let's assume this restoration thing means something along with Gissel and the employer says, okay, come on and let's bargain. Let me tell you something. I'm closing the operation now. Why? Because I don't have any money. I'm not making any money here and I don't want to do it anymore. And I will, I will. My lawyer told me I have to bargain over the effects of this. I'm happy to bargain over the effects and say, the union says we want to put them in cement. You say, if there's any work there, I'm happy to consider them. I can tell you right now, there's not much, anything else you want to know on effects, I'm done. Isn't that lawful? I don't think so, your honor, because what more the employer has to do? Well, if I'm assuming that under your hypothetical, this court has enforced the board's order. And in that case, the board's order requires the employer to reopen Concrete Express before it can decide to close it down. He's well-advised. Counsel says reopen it. It's not worth, you don't want to spend more lawyers fees with this. Just tell them it's reopened because the board told you to. Tell the union to come in. Let's bargain. They come in and say, we're reopened now. We're going to close. We have a right to close. We're going to close. However, my lawyer told me I have to bargain over the effects of the closing. I'm happy to bargain with you over it. What questions do you have? We're closing this place down. And I'm not saying it by virtue of having previously announced it. We're closing it down beginning tomorrow because I don't want to be in the business anymore and I'm not making any money. And so there, what questions do you have? And the question is, well, what about cement? Well, we'll look and see if there's any work there. I'll certainly consider your people, but we're closed. Anything else you want to know on effects? That's all the employer has to do. Right. Your employer, your honor may well be right. I don't know. No, no, no. I will. No, no. Finish it up. Just like, no, I'm not trying to equivocate. I'm just saying, I don't know if there would be some kind of charge that the union could file at that point, or if there is, they could argue that the employer did not make, you know, a, no, no, no. Just like I was trying to do with the other side. I mean, I had lots of hypotheticals on. No, no, no, no. I understand. I understand. In that case, in that case, the council sat him down, right? Don't fool around. You have to be pleasant. You have to be respectful. You have to say, I have a duty to bargain and I'm here to bargain. But you know what? That duty only involves effects of closing because I am closing. I think, I think in that case, your honor is correct. They don't have to anything more than that. However, I would point out your honor that they say that they were losing money, but we, as you, as you've mentioned, there's no, there's no, that's absolutely not substantiated by the record. I also point out you're going off the track. Wait, no, no. I want to make sure I want to get you on this track to make sure you're not disagreeing with what I'm seeing in this case. It's a weird situation. It doesn't matter losing money or not in my scenario. No, in your scenario, they could come back in and say, a union can say you, you claiming you're losing money. No, I don't want to do this anymore. But your honor, I hate the business, but your honor, that, that your, your scenario would apply. I think in any restoration case of the board, yeah, may. And so I'm not sure why, I'm not sure why that's what I'm trying to understand. What does this restoration thing mean? The employer is forced to come back into business in this situation. Now make it the, for your purposes, the worst situation. You said, no, I'm not losing any money. I could make a ton of money, but you know what? I don't want to. Sure. I want to be in cement and I'm happy to bargain with you over the effects and then I'm done and I'm going to do it. Honestly, I'm going to bargain any effects you raise with me. I'm going to discuss with you, but I'm going out of business. I understand your honor. And, and I think your, your, I, I, I will assume that you are right on, on, on this, on, on the, that the, that the employer could do this. I don't, I don't have a quarrel with that, but I think that I think that your quarrel, I think that wait a minute, let me finish it. I'm sorry. Easier case, right? If the employer really is strapped economically, right? Sure. It's an even easier case, right? Except that we have not only did they not show good evidence regarding RAV, we have absolutely zero evidence regarding the company's overall finances, Concrete Express. It's possible Concrete Express is making money hands over fist and they could easily reopen RAV. We don't know. We have zero information about companies. When you say easily open RAV, you're talking about a different employer. That I'm really trying to pin you down. Do you really mean to say that an employer can be told, even though you don't want to do it, you have to open RAV or is the restoration order, nothing more than, no, you can't close it the way you did it, the way you did it was unseemly. So you have to open it again and maybe we'll be lucky and maybe you'll change your mind. So you have to go through the pretense of opening it again, but the employer can still say, but I'm closing it now. I'm going to bargain honestly with you over effect, but I'm done. Perhaps I missed the point of your question earlier, but there is no question that the board cannot force an employer to stay in business ad aeternum just because they just because they closed for unlawful purposes. No, I'm sorry if you ever, if I ever seem to. What difference does it make that the record shows that Cement is making money hand over foot in my scenario? In your, in your scenario of if they just want to get out, it makes, it makes no difference. They can, they can still do that. But I would suggest your honor that your quarrel is with the board's restoration order with, with the idea of the restoration remedy and this court and others have held that that's a perfectly legitimate remedy. No, I think, I think you're going to probably find, and I, I wouldn't swear to it. But I suspect you'll find in those cases, there probably was a business that was maintainable and someone willing to maintain it. That just begs the question I'm trying to raise in this situation where the employer is saying, probably with some force, I'm not making anything. It's small, it's insignificant, and I'm done. Whereas in some of these other cases, that was not really what was going on, but at any event, it doesn't matter. Even in the cases you're pointing me to, they didn't address the question I'm raising. And I want to make sure I understand what's here because those cases could end the same way. Those employers could also say, okay, let's bargain effects and we're done. Sure. Yes, absolutely. And, but I would, I would also add your honor that this is, that's the reason we have a compliance proceeding at that show. Really? It has basically gets a second bite at the Apple to show that financially it's an undue burden to reopen our AV. Yeah, but there's an easier way to do it. Don't go to compliance. That's more lawyers fees. Just say, come on. My lawyer told me, come on, let's bargain. Incidentally, here's our proposal. We're going out of business. Why? Because we don't want to be in business anymore. We don't need to go to compliance. We're not even going to argue about and then saying, no, no, no, no, no, no, no, no. What do you mean? Resetting up? Well, that's part of the board's order, right? I'm reset. What does that mean? To bring in desks and lights? No, there were no desks and lights. There was just, but I don't know that see, this is exactly what's driving me crazy about this. What do you mean? Reset up? No, no. The board order means they've got to go release space. Yes. They are supposed to set, they are supposed to reopen RAV as it existed on the date of the unfair labor practice. That includes, I've got to go now leave some spaces that I'm about to tell you I'm not going to use because I don't want to be in business anymore. That's why I'm not understanding the Gissel and restoration. That can't be what the board's order is. I have to go leave space, even though as a matter of law, I can tell you one day after I don't want to be in business and that's lawful, but I have to go leave space. Your honor. That's, that is what the restoration order that this court has enforced in. I think you'd have to send me if you want to do after argument submission to show me that that's what was happening in a situation where the employer did not want to remain in business. I, I don't know your honor about not wanting to remain in business. I don't know if that's the case here. And I that's, I don't know that in other cases, the board can, the board considers as a factor, the employer's interest in remaining in business. What the board looks at is whether they close the business with anti-union animus in order to chill the other employees at another entity from engaging in section seven protected conduct. If after the, if after the board's ruling as enforced by this court, the, the employer decides that it doesn't want to keep to stay in business, that wouldn't be part of the record within, you know, as decided by the, by the board that can happen after the fact. So I know that I can find you a case in which the employer says, but I don't want to start over. Don't make me start over. I really don't want to do it. What I can find you as a case that says you have to reopen your business as it existed at the time. In fact, that's what the, what the, what the order in this case says. All right. Okay. I have my answers from you. I have answers from both of you in this very strange case. All right. Judge Taylor. I just have a, yeah, I just have one, one question. I want to try to get at this, at what judge Edwards is asking in a slightly different way. So the ALJ said that the findings regarding, or the violation regarding the closing of the business and the firing of Gonzalez were, he called them alternative remedies, right? I mean, Oh, with regard, I'm sorry. With regard to Gonzalez specifically. Yes. Yeah. Gonzalez and the closing, they're alternative. So when I see that in a brief, what I think is okay, our court, we need to decide. We don't have to decide both of those. We can, we can deny the petition. If one of them, if we find, for example, that the Gonzalez firing, that the, that the, that the finding that Gonzalez was fired for union activities is supported by substantial evidence, then we can, we can deny the petition. We don't have to go on and decide, address the, the other violation of closing. Is that correct? No, your honor. If I understand your question, the, where the, where the board, where the board said that about them being alternative findings was only specifically with regards to Gonzalez's termination. And if you'll let me explain the board, the board made one finding that under Darlington, the company unlawfully closed REV for the reasons that I was just, I'm sorry. Could you, I, you just broke up the internet problem here. Could you start after you said, let me explain. Sure. Okay. That's a good, that's a good place to start. So the board made one finding, which was the one I was discussing with judge Edwards, that the company violated the act by closing RAV with the intent of chilling union activity at concrete express. That's one finding. The board also made a finding that Gonzalez was unlawfully discharged. And what the board said is that there are two ways to find that Gonzalez was unlawfully closed. It follows that Gonzalez's discharge as a result of the unlawful closure is unlawful itself. Alternatively, we can find, say the court of appeals finds that REV was not unlawfully closed. We can still find under right line that Gonzalez was unlawfully fired for anti before engaging in union activity. Does that make sense? Um, so you're saying that we do have to decide both issues, right? Yes. In short, that's what I'm saying. But, but, uh, but I'd like, I'd like to be sure I'd like to be sure that I find that explanation. I mean, okay. I get what you're saying. Did I miss something in the briefs? Was that in the briefs? Perhaps, perhaps the briefs were, were ill, um, were not written as artfully as they should have been. The, the, the place in the decision where I would, um, that where I would direct you is, um, on page 11, the, it says REV closure and discharge of I can find, I've found already that, um, or no, he's going to find later on, but I, on the, on one hand, I can find the Gonzalez was fired strictly for engaging in unit activity under right line, but I can also find that he was fired unlawfully as collateral damage, if you will, from the unlawful closure of REV. So that, that is at page 11 in the, in the board's decision. And I'm, I'm happy if you want to come back to me after Mr. I'm sorry, that's enough. Thank you. I get your point. I get, I take your point. Sure. Thank you, Karen. One judge Henderson. One last question. Do you suppose the record shows the, uh, as, as we proceed forward, uh, it now shows, I don't care what it did show in the hearing before the board that this operation doesn't exist as a business and any longer, it doesn't, it doesn't have, it doesn't have the required license. Uh, it doesn't have the lease space. Uh, it's not authorized by the state to do whatever it is they used to do. Are you saying today or at a compliance hearing today, meaning post a board hearing, you know, now compliance, I mean, it can get to a compliance, but let's assume that's the situation. They don't have a license to do this work anymore. They don't have a lease space anymore. Uh, they have a Gissel bargaining order. That's understandable. And you can bargain over effects. That would make sense to me. You can, the effects of the closing, but in terms of restoration, what are you talking about? They say we don't have a license. You mean we have the license? The license is, is, is building specific. It's not, it doesn't go with the business at Edison, at Edison, the building had a license in the state. You have to have a license to do the kind of work you're doing no matter where the lease spaces. No, you need the lease. That is not my understanding. My understanding is registration. That seems really strange to me that you can be in a business to do something merely because you have a building and claim to be doing something, but you don't otherwise have a license to do what it is you want to do. That makes no sense. That was my understanding from reading, frankly, the company's pleading. Well, let me ask counsel about that. Cause that sure makes no sense. I can do whatever I want as long as I have a building. I don't think so. That can't be. And so assume I'm right. My thing is right. I'll have a license if it's required and maybe it's not required. Sure. They don't have a license. They don't have a lease and forget what they prefer to do, but that's the way they stand. And now what they got a Gissel bargaining order. So yeah, maybe they have to bargain about something, but now what's your argument with respect to restoration. I want to make sure I understand this. No, I understand my argument. Your honor is that unless it poses an meaning that they cannot afford to do it, or if it would endanger the health of the remaining business, they must fight. They must lease a new building with the proper registration and they must rehire the two employees that they must go get. They most must go get the necessary license. Exactly. They've got to recreate themselves, not themselves. Just the, just the, just the one part of their business that they've got to recreate a business entity. Right. Right. And now is there some case law and I'm happy to look at it that says you have to recreate a business entity that does not really exist on the date when you'll now be required to do it. I'm not talking about, can you find cases where the company, the board said to the company, you have to get this up to speed again. I'm talking about a situation where not only the building's gone, the lease is gone, the license is gone. And the board has said, not withstanding all of that, you have to recreate it, go find a lease, go find a license and make yourself a real operation again. And then, oh, incidentally, as you and I have just spent a half an hour talking about incidentally, then you have the right to bargain and say, we're not going to stay like this. So you'll cancel all of what you just did in one day. Show me the case. Okay. I will file something with the court. I hope by the end of today, if not tomorrow. Now, don't give me the ones you've been giving me. I understand all of that. I want one that they're not news to me. I want one where it's not there anymore. And the board says, no, no, go create it. Very good. Okay. All right. Judge Edwards, are you finished? I am, Judge Henderson. Thank you. Judge Tatel, are you finished? Yes. All right. Mr. Tulenship will give you two minutes in response. Can you answer the question first, just so I have this information before I forget? Yes. Does any of this, is there a license that's required? My understanding is RAV was registered as a repair shop. So registered, my understanding is registered would be quote unquote, a license. But in order to be registered, in order to participate in that business, the building that you're in has to have certain requirements under New York law as to what is required in order to perform repairs on trucks, cars, and again, some automatic sprinklers, some fire alarms, some standpipes, oil and water separators. So that when, you know, things go in the drain, you're not getting oil and grease that are going in the, in the city sewer system. Right. So that, that is my understanding of the motor vehicle repair shop. So when I'm registered, yes, that is my license, but you also have to have an actual building that meets all of the specifications. Okay. And then just one point I wanted to bring up, it's not enough under Darlington to show that closing RAV would have the foreseeable consequence of possible union chilling at the other location. They, the general counsel has to show that the motivation behind closing RAV was to chill unionism at Concrete Express. When he closed RAV, Concrete Express had already had its election. All, all the quote unquote unfair labor practices that he mentioned had already happened at Concrete Express. If he wanted to chill unionism at Concrete Express, he could have closed down RAV right before the election. And he did not. No, that argument is not a winning argument because there's so many cases that will show you that you can have the chilling effect. It doesn't matter when you're saying to these related employees, if you push us in collective bargaining or anything else, we'll close you down too. That's what the board cases say. We'll take, we'll take you out. That's our threat. So, and we'll do it at any time. We're so angry about this. And if you keep pushing us in collective bargaining and you keep pushing us with a union, we'll close you. That's all they need. I'm, I'm more, I'm more troubled to try and understand what this restoration means, but okay. I don't have anything more, Judge Henderson. Thank you for the time. All right. All right. Counsel, are you finished with your reply? Yes, Your Honor. All right. Well then let's do this. Mr. Sauter, you have until noon tomorrow to file what you want to file as far as authority and Mr. Tulansic, you have until noon on Friday to file anything in reply. Okay. Thank you, Your Honor. And Mr. Sauter, I would, I would respectfully request, please don't give me the cases that you know I understand. I'm giving you a precise kind of scenario of a reconstruction where it doesn't exist. And, and when, and everyone understands with a Gissel bargaining order in hand, that employer, that employer still can be made to bargain about effects. And you, you're telling me, I want to see a case where the board says, notwithstanding they got the Gissel bargaining order, they still can be forced to bargain about effects, but we're going to make them recreate themselves, get the license, go get a lease, get a building, even though the next day we all agree they can walk out. All right. Anything further? Madam Clerk, would you give us an adjournment?
judges: Henderson, Tatel, Edwards